[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 9, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-16267

_____

D. C. Docket No. 02-00073-CV-5

BOBBY E. SAULS,
TERRI L. SAULS, et al.,

Plaintiffs-Appellants,

versus

PIERCE COUNTY SCHOOL DISTRICT,
PIERCE COUNTY HIGH SCHOOL, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(February 9, 2005)**

Before ANDERSON, DUBINA and BLACK, Circuit Judges.

BLACK, Circuit Judge:

This appeal involves teacher-on-student sexual harassment. Appellants

Bobby and Terri Sauls allege their son, Appellant Dustin Sauls, was sexually

harassed by Beth Blythe, a former teacher at Pierce County High School.

Appellants claim Pierce County School District (PCSD) violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (Title IX), by ignoring the sexual relationship that allegedly developed between Dustin and Blythe. Appellants also seek to recover damages against PCSD under 42 U.S.C. § 1983, arguing PCSD is liable for Dustin's injuries based on its custom of ignoring Blythe's discriminatory practices. Appellants argue the district court erred when it granted summary judgment for PCSD on both counts. We affirm the district court.[1]

## I.  BACKGROUND

In reviewing a grant of summary judgment, we are required to view the facts in the light most favorable to the nonmoving party. *Davis v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1371 (11th Cir. 2000). We, therefore, set forth the facts of this case in the light most favorable to Appellants.

Dustin began attending Pierce County High School in the fall of 1998. In general, Dustin performed poorly in school. During his sophomore year, Dustin failed several classes and missed a total of 81 days of school. In addition, Dustin had disciplinary problems involving alcohol and marijuana use.

---

[1] We note the district court also dismissed several claims brought against other Defendants named in the Sauls' complaint; however, those issues have not been challenged on appeal, and we do not consider them.

Dustin first encountered Blythe in the first term of his freshman year, when he was taking a course taught next door to Blythe's classroom. During the fall of 1999, the first term of his sophomore year, Dustin had Blythe as a science teacher—a class which he failed. At the time, Dustin and Blythe had nothing more than a teacher/student relationship.

In the summer and early fall of 2000, their relationship became more personal. Dustin's younger sister, Ashley, was starting high school and began participating in Flag Corps, an activity which Blythe was running at the time. Also, Blythe's son, Ben, was starting the second grade, and Dustin's mother was his teacher at Patterson Elementary School. Blythe started visiting the Sauls' home on a regular basis to speak with Dustin's mother about Ben and to drive Ashley home from Flag Corps practice. Blythe would socialize with the Sauls family during these visits, and she soon became friends with Dustin's mother. Blythe and Dustin's mother would discuss their personal and marital lives. Moreover, Dustin's mother agreed to look after Ben at the elementary school, and Blythe promised to look after Dustin and Ashley in high school.

The sexual relationship between Dustin and Blythe allegedly began around the end of 2000—about halfway through Dustin's junior year. Dustin was 16 years old at the time, and under Georgia law, he had the legal capacity to consent

3

to sex.  *See* Ga. Code Ann. § 16-6-3(a) (defining statutory rape as sex with someone under 16 years of age).  Most of their alleged sexual encounters occurred on school grounds.  Blythe would write notes to other teachers requesting that Dustin be allowed to come to her room for various reasons.  Dustin primarily missed his Biology class to meet with Blythe, although he missed other classes as well.

In addition to their encounters on school grounds, Dustin would stay at Blythe's home when her husband went on fishing trips, and they once met in a hotel room.  During their relationship, Blythe allegedly provided Dustin with prescription drugs and pain pills.  She also paid Dustin's speeding tickets, and gave him money, clothes, and a cell phone.  While the purported sexual relationship was ongoing, Dustin's academic performance improved—he passed all his classes during the 2000/2001 school year.

On March 24, 2001, Dr. Joy Williams, who was then the assistant superintendent of the Pierce County School System, received an anonymous email alleging Blythe had inappropriate relationships with specific students.  The named students had either graduated or dropped out of school.  Dustin was not mentioned in the email.

In response to the allegation, Dr. Williams conducted an investigation. She asked Lowell Williamson, the principal of Pierce County High School at the time, and Don Spence, the superintendent at the time, whether they knew any relevant information concerning Blythe. Williamson explained he had received a complaint in October 1998 about a potentially inappropriate relationship between Blythe and a student named Brandon Davis. Williamson investigated the allegation at that time. He spoke with Davis's mother, who complained Blythe had been removing Davis from some of his classes. Williamson interviewed Davis, who vehemently denied having any inappropriate relationship with Blythe. Williamson also interviewed Blythe, who similarly denied the allegation. Williamson found their denials credible, and he did not uncover any evidence supporting the validity of the allegation.[2] He warned Blythe to always keep her conduct with students beyond reproach and to avoid any situation that could be viewed as inappropriate. After interviewing Davis and Blythe, Williamson informed Superintendent Spence of the allegation and the results of his investigation. During his discussion with Dr. Williams in the spring of 2001, Williamson indicated he had not observed any inappropriate conduct by Blythe,

[2] Two assistant principals were present during Williamson's interview of Davis, and they similarly concluded Davis's denial was credible.

and he had not received any other accusations against her.  He provided Dr. Williams with a copy of his notes from the 1998 investigation.

After discussing the 1998 allegation, Williamson and Dr. Williams interviewed Blythe about the March 2001 email.  Once again, Blythe strongly denied any misconduct.  Dr. Williams warned Blythe, orally and in writing, to avoid even the appearance of impropriety in her dealings with students. Dr. Williams told Blythe to avoid any potentially suspect situations where she would be alone with male students at school or other social functions.

In July 2001, Dr. Williams—who, by that time, had been promoted to superintendent—received a phone call from a "concerned citizen" claiming to have seen Blythe's and Dustin's vehicles parked in the woods.  The anonymous caller did not claim to have witnessed any sexual or inappropriate acts between Dustin and Blythe.  Dr. Williams promptly notified the Pierce County Board of Education about this allegation.  She also reported the matter to the Professional Standards Commission (PSC), the Georgia entity responsible for investigating allegations of unethical behavior by educators.  Dr. Williams explicitly requested PSC to conduct an investigation of Blythe's behavior.  In addition, Dr. Williams discussed the allegation with the local police department.

Dr. Williams also directed the high school's new principal, Anthony Smith, to prevent any unnecessary contact between Blythe and Dustin. Dr. Williams instructed Smith to monitor their activities and to report any suspicious behavior to her. Throughout the fall of 2001, Smith and other members of the high school staff often stopped Dustin in the hallway and questioned him about what he was doing and where he was going. Furthermore, Smith interviewed Dustin and expressly asked him whether he was engaged in an inappropriate relationship with Blythe. Dustin assured Smith that he and Blythe did not have such a relationship. Dustin has now admitted that he lied to Smith and other school officials to conceal the nature of his relationship with Blythe. At the time, Dustin also lied to his parents when they asked him about his relationship with Blythe.

Based on Dr. Williams' request, PSC also conducted an investigation of Blythe during the fall of 2001. John Grant, who was heading PSC's investigation, interviewed Dustin and his father. They both denied that any inappropriate relationship existed. Grant also called Dustin's mother, who stated she did not believe Dustin was involved in an illicit relationship with Blythe. Moreover, Blythe denied any wrongdoing during her interview with Grant.

As part of his investigation, Grant interviewed some former students of the high school, including Davis. Davis now admitted to Grant that he did have a

7

sexual relationship with Blythe while he was a student. Davis also, however, admitted he concealed this relationship and denied its existence when questioned by school officials at the time.

In early December 2001, a substitute teacher discovered a note addressed to Blythe, which Dustin admittedly had written. In the note, Dustin demanded three things from Blythe and stated if his demands were not met, he would "call that dude [John Grant] and me and him will have a long talk on how you fed me full of shit for a year that way you could fuck me at school everyday. . . . I get what I want or I tell what they want to hear." He later explained in his deposition that the three things he had demanded from Blythe were (1) to receive $100, (2) to get his cell phone back, and (3) to have sex with her at a specific time.

After discovery of the note, Dr. Williams again interviewed Blythe, who continued to deny having any sexual involvement with Dustin. Nonetheless, she resigned her teaching position on December 20, 2001. On May 9, 2002, Blythe voluntarily surrendered her teaching certificate.

On June 27, 2002, Appellants filed a complaint in federal district court, alleging PCSD, among others, remained idle in the face of known teacher-on-student harassment. Appellants argued Title IX was violated because Blythe's harassment of Dustin was ignored and allowed to continue. In addition,

8

Appellants sought to recover damages for Dustin's injuries under § 1983. The district court granted summary judgment for PCSD with respect to both claims. This appeal followed.

## II. STANDARD OF REVIEW

We review the district court's grant of summary of judgment de novo. *Davis v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1371 (11th Cir. 2000). "We are required to resolve all reasonable inferences and facts in a light most favorable to the nonmoving party." *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1216 (11th Cir. 1999) (citation omitted).

## III. DISCUSSION

A.    *Title IX Claim*

Title IX provides, in pertinent part, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied private right of action under Title IX for cases involving intentional sexual discrimination, and it has held money damages are available in such lawsuits. *Franklin v. Gwinnett County Public Schs.*, 503 U.S. 60, 65, 75, 112 S. Ct. 1028, 1032, 1038 (1992). The Court also has established that a teacher's

sexual harassment of a student constitutes actionable discrimination for the purposes of Title IX. *Id.* at 74–76, 112 S. Ct. at 1037–38; *see also Davis*, 233 F.3d at 1371.

Our analysis in cases involving teacher-on-student sexual harassment is governed by the Supreme Court's decision in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S. Ct. 1989 (1998). In *Gebser*, the Supreme Court held a school district will not be liable in damages under Title IX for teacher-on-student sexual harassment "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct."[3] *Id.* at 277, 118 S. Ct. at 1993. The Court defined the deliberate indifference standard as "an official decision by the recipient [of federal funds] not to remedy the violation." *Id.* at 290, 118 S. Ct. at 1999.

Although it reached the correct conclusion, the district court relied on the legal standard applicable in Title IX claims based on student-on-student sexual harassment.[4] The Supreme Court has applied a more rigorous standard when a

---

[3] In *Gebser*, the Supreme Court emphasized a school district will not be liable under Title IX for a teacher's harassment based on principles of constructive notice or *respondeat superior*. 524 U.S. at 281–290, 118 S. Ct. at 1995–99.

[4] This Court has held "we must affirm the summary judgment if we find that the district court reached the right result notwithstanding its reliance on an incorrect rationale." *Solitron*

10

Title IX plaintiff seeks damages against a school district for student-on-student harassment. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650–53, 119 S. Ct. 1661, 1675–76 (1999). The Court explained student-on-student harassment will rise to the level of actionable discrimination under Title IX only if the harassment is "sufficiently severe." *Id.* at 650, 119 S. Ct. at 1674. The Court concluded that to prevail on a Title IX claim based on student-on-student harassment, the plaintiff must establish not only that the school district was deliberately indifferent to known acts of harassment, but also that the harassment was "so severe, pervasive, and objectively offensive that it denie[d] its victims the equal access to education that Title IX is designed to protect." *Id.* at 650–52, 119 S. Ct. at 1675; *see also Hawkins v. Sarasota County Sch. Bd.*, 322 F.3d 1279, 1285 (11th Cir.), *reh'g and reh'g en banc denied*, 67 Fed. Appx. 590 (11th Cir. 2003).

Because this case involves teacher-on-student harassment, Appellants need not establish Blythe's misconduct was "so severe, pervasive, and objectively offensive" that it denied Dustin equal access to educational programs or opportunities. Title IX plaintiffs, like Appellants, seeking to recover damages against a school district for teacher-on-student sexual harassment must establish two things to survive summary judgment: (1) a school district official with the

*Devices, Inc. v. Honeywell, Inc.*, 842 F.2d 274, 278 (11th Cir. 1988) (citation omitted).

11

authority to take corrective measures had actual notice of the harassment; and (2) the official with such notice was deliberately indifferent to the misconduct. *See Gebser*, 524 U.S. at 290–93, 118 S. Ct. at 1999–2000; *Davis v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1371 (11th Cir. 2000).

In this case, Appellants argue PCSD violated Title IX because it was aware of Blythe's sexual relationship with Dustin and other students, and it was deliberately indifferent to stopping her harassment. We disagree.

The parties dispute when PCSD received the actual notice required under *Gebser*. Appellants contend PCSD had actual notice of Blythe's misconduct in either October 1998 (the Davis allegation) or March 2001 (the anonymous email). PCSD, on the other hand, asserts it did not receive notice until June 2001, when Dr. Williams received the phone call about Dustin's and Blythe's vehicles being parked in the woods. We need not, however, address the actual notice issue because regardless of whether PCSD had the requisite notice in October 1998, March 2001, or July 2001, Appellants' Title IX claim fails because they cannot demonstrate PCSD officials acted with deliberate indifference at any of these times. Rather, PCSD officials sufficiently responded to each report of misconduct they received. Therefore, our decision rests on *Gebser*'s requirement that the school district act with deliberate indifference.

12

This Court examined and applied the deliberate indifference standard in *Davis*. 233 F.3d at 1373–75. In *Davis*, the plaintiffs asserted the defendant school district knew or should have known Kelvin Mency, the teacher in question, was sexually abusing them because school officials had previously received a complaint involving Mency and a student who was not one of the plaintiffs. *Id.* at 1372. According to the prior complaint, Mency had inappropriately touched the non-party student during a football game and tried to touch her again at the water fountain, but she moved away. *Id.* at 1372–73. In response to this complaint, the high school principal ordered an investigation. *Id.* at 1373. School officials interviewed the alleged victim and other students. *Id.* They also interviewed Mency, who denied doing anything improper. *Id.* The investigation failed to uncover reasonable evidence demonstrating Mency's conduct was inappropriate. *Id.* Based on their interviews, the school officials concluded the touching was probably inadvertent and not sexual in nature. *Id.*

In addition, the high school principal in *Davis* instituted corrective measures. The principal removed the non-party student from Mency's after-school physical education class. *Id.* The principal also offered to remove the student from her regular physical education class with Mency, but the student decided she wanted to stay in that class. *Id.* The principal directed Mency to

13

avoid out-of-class contact with the alleged victim and not to be alone with any female students. *Id.* at 1374. The principal followed up with the alleged victim several times, but she did not have any further complaints. *Id.* The principal also monitored Mency, but did not observe any indiscretions. *Id.*

In light of these actions, we found the school district and its officials "responded with anything but deliberate indifference." *Id.* at 1373. We noted a school district is not deliberately indifferent simply because the measures it takes are ultimately ineffective in stopping a teacher from harassing the plaintiffs. *Id.* at 1375 (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456 n.12 (5th Cir. 1994) (applying deliberate indifference standard in § 1983 analysis and holding "many good faith but ineffective responses . . . might satisfy a school official's obligation in these situations, *e.g.*, warning the state actor, notifying the student's parents, or removing the student from the teacher's class")). We explained the relevant inquiry is not whether the measures taken were effective in stopping discrimination, but whether the school district's actions amounted to deliberate indifference. *Id.*

In this case, each time PCSD officials received a complaint concerning Blythe, they responded in a fashion similar to that of the school officials in *Davis*. PCSD officials responded to the reports in October 1998, March 2001, and July

14

2001 by investigating the allegations and interviewing the relevant parties.  School officials also consistently monitored Blythe's conduct and warned her about her interaction with students.

1.    *October 1998*

Even if we assume, without deciding, PCSD had actual notice of Blythe's harassment in October 1998, it did not respond with deliberate indifference at that time.  Principal Williamson started an investigation the day after he received the complaint about Blythe and Davis.  Williamson interviewed the two separately, and they both denied the allegation.  He also spoke with Davis' mother.  Williamson, who had been a school administrator for over 15 years, determined Davis's and Blythe's denials were credible.  This conclusion was reinforced by two assistant principals, who similarly found Davis's denial trustworthy.  Williamson was unable to find any evidence supporting the allegation that Blythe was engaged in an inappropriate relationship with Davis.  Like the principal in *Davis*, Williamson did not observe any misconduct by Blythe and he did not receive any further complaints about her until March 2001.

Even though Williamson failed to find any evidence supporting the allegation, he nonetheless issued a warning to Blythe.  He directed Blythe to avoid any situation that could be construed as inappropriate and warned that her

15

interaction with students must always be beyond reproach. Williamson notified his superior, former Superintendent Spence, of his investigation and conclusions. Under *Davis*, Williamson's response to the 1998 complaint did not constitute deliberate indifference.

2.    *March 2001*

Assuming PCSD officials had actual notice in March 2001, they again did not respond with deliberate indifference. After Dr. Williams, the assistant superintendent at the time, received the anonymous email, she investigated the allegation. She quickly learned none of the students named in the email still attended Pierce County High School, and one of the students, Davis, had been the subject of an investigation in 1998. Dr. Williams interviewed the superintendent, Spence, and the high school principal, Williamson, about Blythe's behavior with students. Principal Williamson explained he was unable to find any evidence to support the 1998 complaint concerning Davis, and he provided Dr. Williams with a copy of his notes from that investigation. Dr. Williams, along with Principal Williamson, interviewed Blythe about the email, and she, once again, vehemently denied the allegations.

Although PCSD still did not have any evidence of misconduct by Blythe, Dr. Williams took corrective action. Because the email only referred to former

students, Dr. Williams did not have the option of removing any of the students from Blythe's classes. Dr. Williams did, however, admonish Blythe both orally and in writing, and directed her to avoid even the appearance of impropriety when dealing with students. Similar to the warning issued in *Davis*, Dr. Williams also instructed Blythe to avoid situations where she would be alone with male students. Based on these actions, we conclude PCSD was not deliberately indifferent to the March 2001 allegation.

3.    *June 2001*

Finally, PCSD officials instituted several corrective measures in response to the July 2001 phone call, which alleged Dustin's and Blythe's cars had been seen parked in the woods. This phone call was the first time PCSD had received a report specifically linking Blythe with Dustin.

Soon after receiving the phone call, Dr. Williams contacted the Professional Standards Commission (PSC) and requested that it investigate Blythe. PSC complied with this request and assigned John Grant to conduct an investigation during the fall of 2001. Dr. Williams also notified the Pierce County Board of Education and the local police department about the allegation. She instructed the new high school principal, Smith, to closely monitor Blythe and Dustin, to prevent any unnecessary contact between the two, and to report any suspicious behavior.

17

That fall, whenever Smith or other members of the high school staff observed Dustin near Blythe's classroom, they questioned him about his purpose and destination. Smith also separately interviewed Dustin and Blythe about the allegations. Dustin and Blythe denied the existence of any illicit relationship. They also denied any misconduct when interviewed by Grant. It is undisputed that Dustin lied to school officials and his parents when questioned about his relationship with Blythe.

School officials finally received more concrete evidence of an inappropriate relationship when Dustin's explicit note was discovered in December 2001. Shortly after being confronted with this note, Blythe resigned her teaching post at Pierce County High School. She also surrendered her teaching certificate in the spring of 2002. In light of the many corrective measures taken by Dr. Williams and other school officials, we cannot conclude PCSD was deliberately indifferent to the allegation raised in July 2001.

In summary, we conclude Appellants' Title IX claim fails under the deliberate indifference standard. Even when we draw all reasonable inferences for Appellants, they cannot create a genuine issue of material fact that PCSD acted with deliberate indifference. Although PCSD officials ultimately may have been ineffective in preventing Blythe's harassment of Dustin, they did not act with

18

deliberate indifference. The district court, therefore, correctly granted summary judgment for PCSD on Appellants' Title IX claim.

B.    *Section 1983*

Appellants further argue PCSD should be held liable for Dustin's injuries under § 1983. It is well established that municipalities, like a school district, may not be held liable under § 1983 based on a theory of *respondeat superior*. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388 (1997); *Davis*, 233 F.3d at 1375. To impose liability on a municipality under § 1983, the plaintiff must identify a municipal "policy" or "custom" causing the deprivation of federal rights. *Brown*, 520 U.S. at 403, 117 S. Ct. at 1388. The Supreme Court explained:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Id.* at 403–04, 117 S. Ct. at 1388 (citations omitted).

The Court further explained "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Id.* at 404, 117

19

S. Ct. at 1388. Rather, "[a] plaintiff must show that the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Davis*, 233 F.3d at 1375–76 (citing *Brown*, 520 U.S. at 407, 117 S. Ct. at 1390). Thus, the deliberate indifference standard applies in § 1983 claims alleging a municipality is liable for its failure to prevent a deprivation of federal rights. *Gebser*, 524 U.S. at 291, 118 S. Ct. at 1999 (citations omitted); *Davis*, 233 F.3d at 1376.

In this case, Appellants argue PCSD is liable under § 1983 for the deprivation of Dustin's rights because it had a custom of ignoring Blythe's sexual harassment of students. However, as we explained in our analysis of Appellants' Title IX claim, there is no evidence demonstrating PCSD officials were deliberately indifferent to the reports of alleged misconduct by Blythe. Thus, Appellants cannot establish PCSD had a custom of responding to Blythe's alleged discriminatory actions with deliberate indifference. Accordingly, we conclude the district court did not err in granting summary judgment for PCSD on Appellants' § 1983 claim.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment for PCSD on Appellants' Title IX and § 1983 claims.

AFFIRMED.